The key problem in the case which gave rise to all of the five questions certified by the court occurred on September 27, 1999 when down at the L.A. County Jail they were assembling a line-up. They asked Morris to participate. His substitute counsel was standing outside. Morris then said he was unsure about whether or not to participate in the line-up. He'd like to speak to counsel. He was told falsely that counsel refused to speak to him. Then he said he was not going to do the line-up without talking to his lawyer. The line-up was aborted. It was denied for a reassembled line-up the next day. All of the five questions arose from September 27. The legal question, as I see it, on September 27 was when Morris was in the lockup at the jail and counsel was standing outside, was that a critical stage? Had the right to counsel attached at that point? Because if counsel had attached at that point, then monkeying with the attorney-client relationship by falsely stating that counsel wouldn't talk to Morris was a Sixth Amendment violation. If the right to counsel did not attach yet, as argued by the respondent, until the moment that the line-up actually starts, then we really don't have a Sixth Amendment claim because there's no harm, no foul. But it has to be the law under Wade that the right to counsel attached at this moment when counsel is standing outside, they're assembling the line-up, and the petitioner is falsely told that counsel won't talk to him. Let me ask you, how do you deal with LaPierre? The LaPierre case, how do you deal with that? I don't really recall. I don't recall the facts of that case, Your Honor. The problem, I think it goes back to Wade. In Wade, I cited at 388 U.S. at 233 and 234, the key fact there was that one of the line-up witnesses observed the defendant out in the hallway standing next to the FBI agent while the line-up was being assembled. And that was the problem. But that was an improper line-up under that scenario. Yes. In our case, in any case, a criminally accused does not have a constitutional right to a line-up. That's correct. So how is it a violation of the Sixth Amendment? Look, I don't like law enforcement lying to the defendant in this case. But if it's not, if he had no right to a line-up, he couldn't demand a line-up, let's put it that way, if they didn't want to give him one, why would it be critical for them to have lied to him that his lawyer's outside and he could talk to the lawyer about participating in a line-up? Because what follows from that line of argument is that the right to counsel does not attach until the moment that the line-up is actually, well, they're walking out on stage. But the line-up is when he's put in jeopardy. You see, the line-up is when he's, he could get in trouble or get out of trouble. And if he's never put in trouble because the line-up is aborted, well, give me a lifeline. How am I wrong if I say that it's not critical? If he has no right to the line-up, they don't give him a line-up, how is Wade being violated his right to counsel if he has no right to a line-up? Well, if the question really is, they said in Wade that the line-up is a critical stage. So I think that the precise question is, what is the line-up? If the line-up itself is just the moment that the curtain is drawn and they're standing on stage, that's one thing. But I don't think that that's the law. I think, you know, when they're on deck and getting ready to go out, and he's, that's a critical stage also simply because, as in Wade, things happened before that could impact on the fairness of the line-up. Yeah, but nothing in this case impacted on the fairness of the line-up because there was no line-up. I'm having a problem that there wasn't a line-up. See, why, how could there be a critical stage if he was never put in the line-up, a good line-up or even a suggestive line-up? He was never put in any line-up. So how is he, is Sixth Amendment violated? Well, in this case, there's two answers. Under state law, where this was decided first, there was this case cited, Evans v. Superior Court, where apparently there is a right to a line-up under certain circumstances under state law. They were operating under state law, and that's apparently the state constitution rather than the federal constitution. But it was in his interest to have the line-up. Secondly, in this case, you've got the fact that the lady flunked the six-pack two weeks beforehand, and so there was something in it for him in the line-up. And presumably, the lawyer that's standing outside would have been smart enough to say that. By all means, go forward. He was a little bit uncertain on whether to do it. He wanted to talk to counsel. So I would, to answer your question, say that he was prejudiced by the loss of the line-up simply because he didn't get the shot at the line-up. And that failure to participate in the line-up then was construed as consciousness of guilt. And then the two more serious carjacking and second-degree robbery charges followed, sure enough, the next morning. So under the facts of this case, he was definitely prejudiced the way this unfolded. You say it's consciousness of guilt. So was that argued to the jury? That was not argued to the jury. It was the charging decision. Because they went ahead and charged. That's right. So the problem was that they had the guy on the car on September 10, but they didn't have him on September 8 as the guy who took the car. The jury knew that he flunked the six-pack. They did. They did have that impeachment. That was going to be an impeachment for her in-court identification, of course. And your position is, if he had been in a line-up and she flunked that, he would have had a good shot to have gotten an acquittal. I think it goes beyond that. I think that if she'd flunked the line-up, he never would have gotten these new charges, counts two and three. They would have stuck with the September 10. They had the guy nailed cold on the September 10 fact that he was driving this stolen car. That's a vehicle code violation. But what they didn't have was the September 8 fact that he was the guy that had taken the car from this Mrs. Jacobo. So I mean, I think it comes down to weight. And what does it mean, the line-up? Does the line-up mean as to when the critical stage and the right to counsel attaches? Does it mean the moment when you pull back the curtain and they're scanned on the stage? Well, what I think, and the reason I ask about LaPierre, let me read you the language. This is one of our cases that said, we've held that the right attaches to the period during which the accused is within sight of a potential identification witness. Now, if that controls, then how does that apply to these facts? Well, in Wade, one of the cashiers saw the guy as they were assembling the line-up beforehand. And so here, in this case, there was no line-up. So I can't really speculate about what the configuration would have been. But in previous to that language in LaPierre, we said the right to counsel includes the right to counsel to have present for the entire line-up presentation, which helps you. But then it says, well, we recently declined to decide whether the witness preparation stage triggers the right to counsel. And then it goes on. So I mean, I don't think we have a case that says the witness preparation stage is a critical stage that triggers the right to counsel. And really, isn't that where your argument is? Yeah, I think that I'm not sure the witness preparation stage, you have to go that far. That would be consultation the night before and a week before in making a strategic decision. What we're talking about is counsel standing outside as they're assembling the line-up. And it sounds like there's not much time passed here. And they said, you're going to do this or not? Your lawyer won't talk to you. Let's make a decision right now. And the fact that he was hoodwinked here was pretty much uncontroverted. Does the county acknowledge that the sheriff gave your client, lied to your client when he talked about them? Is this something that your client... No, it arose procedurally on a motion to dismiss supported by three declarations of the two lawyers and Morris. The opposition papers didn't dispute that. And they made various legal arguments about why it doesn't matter legally. So it was undisputed. Now, the victim identified your client at the preliminary hearing. Yes. Right. Correct. And that was after she couldn't make the ID identification through the six-pack, the six pictures that were shown. Yes, and the ID was the next morning after the aborted line-up. Yes. So when your client was in the courtroom, was he dressed in blue? Yeah, he had the jumpsuit for a prelim. Were you there? No, no. Your Honor, I was there. And a public defender was there? Correct. And who else was in the courtroom? Well, it was apparently a courtroom in the Compton Municipal Court where, I don't know who else was there. It was a prelim, so I would imagine there would be other people, other things on calendar that day. But Morris and his lawyer were the only ones sitting at counsel table. Ms. Glover was his lawyer that day, and they were sitting at counsel table. And the victim made the identification, whereas two weeks earlier, on September 13, she'd been unable to make the identification from the six-pack. What was the fact that she was lied to and that they were thinking of having a line-up and that he was lied to about his lawyer being outside, did that enhance or in any way affect the in-court identification that occurred during the trial? No. That did not come into evidence. The argument is as to prejudice and how he was hurt by this is that that caused the charging decision the next day. And it was assumed that he didn't want to be chickened out. He didn't want to assume. So that's consciousness of guilt. And therefore, the serious charges followed the next day. Did the prosecutor tell you this? No, but it's pretty clear from the way it unfolded that speculated. Well, they arrived the next morning after the lineup and first thing in the morning, he's confronted with these two new charges. And it was pretty clear up until then that they had him on the September 10 drive in the car, but they didn't have him before. And the victim had flunked the six pack. And then here the guy chickens out of a lineup, supposedly. And they said, oh, OK, this is consciousness of guilt. And you got it the next morning. No, no, I don't. I wouldn't be speculating. But if we extend this, this Sixth Amendment right, then we would have to say that not only do you have a Sixth Amendment right during a lineup, so your attorney can see whether it's being done properly or suggestively, you have a Sixth Amendment right. Even if there is no lineup and you're questioned about whether you're part, you part, you would participate in a lineup. That's part of the lineup. Just to zero in on that. I'm arguing that in this scenario, that was the lineup. The lineup included the, you know, when he's on deck and getting ready and able to that morning talk to counsel within minutes of the lineup. That's the lineup. Well, yeah, but the purpose of the lineup is to ID for the for the victim to the IPOL, who is the responsible party. And if it didn't affect the victim's ability to identify the defendant in court because he didn't participate in the lineup. How could it be a Sixth Amendment violation? Because if if we're correct and the lineup included that consultation immediately leading up to the lineup, then and there is no lineup, then we have to articulate some sort of prejudice. And that's what I was going into. So your argument is that the bailiff, the deputy sheriff, there have been honest and said, yeah, your lawyer's outside. You want to talk to him or talk to her that there then would have been a lineup and that somehow there would not have been a complaint filed the next day with these two other charges. Yes. And this what you're saying. Let me ask you this. The thing I wondered about more than anything else was this in-court identification at the preliminary hearing. No objection was made. Well, there was a there was a motion filed a few days. I'm not I don't think there was an objection at that time. The motion to dismiss where all this was aired was filed after, you know, a few days after on January three of 2000. That the prelim included that the prelim was September twenty eight of ninety nine. The motion was filed January three of 2000. So what happened at the trial? At the trial, the lady reiterated and identified Morris. Well, that's not on the field before us. That's not a question. The input, the in-court identification is not right. Right. The the the key. I think the key comes down to was there. Does the lineup include this situation of where the the Sixth Amendment right to counsel? Does it include that right leading up to a certain claim for ineffective assistance of counsel? Yes, that's that's one of the claims, your honor. The fifth claim was the this motion based on the counsel's failure to object to the in-court identification. No, the the the ineffective assistance claim was the deficient motion practice that once this motion was filed, it was a failure to get this get a merits hearing on it. The lady, the counsel for Mr. Morris filed up here and the first judge said it was premature and it should be brought up before the trial court. It came in front of a second judge, this judge Cherovsky, who basically said, well, this has been heard already. And the fact is that it hadn't been heard. It had been denied without prejudice. And so the lawyer at that point kind of failed the Mark Twain test that the court was talking about being timid and inaccurate. She failed to say, judge, this was never heard. It was denied as premature. And then also the failure to raise this in the trial court thereafter. So it's ineffective motion practices. Is the claim effective? All right. When are we here? Thank you. May it please the court. David Glassman, deputy attorney general for the respondent. I would also like to walk through the chronology to address questions that have come up in the courts. That's correct. Your honor. Tell the attorney general he needs to think before the words come out of his mouth before the Supreme Court. You know, I mean, well, still, we admit saying the Ninth Circuit is a runaway court. You've never been here. Run away. Well, I'll report back whatever you'd like. He thought he probably had a very knowing, you know, probably thought he had a captive audience there. I'm sure you'll take the report. Well, welcome to the panel. I'm sorry. Well, for the time being, moving to this case, to be 82 years old, you can say whatever you want. Your honor, I was going to point out when you when you summarize your 40 years, six months and one day on the bench, I think the one day was the first case we heard today. But at any rate, moving to the chronology in this case, if I could please the because I want to clarify some both legal and factual matters. The lineup that was scheduled in this case was to occur on September the 27th of 1999. And on that date, as we know, the petitioner refused to participate in the lineup. The following day, when the parties were in court for a already scheduled preliminary hearing, the only indication that was given was just that, that the defendant had refused to participate. It is only in the subsequent preparation of a declaration months later that the defendant adds that an unnamed deputy sheriff told him falsely that that his lawyer would not appear. So it is not. It is not. But but it was falsely told that. No, your honor, we do not. The point being that at the contemporaneous time, that is when he came back before the judge for the preliminary hearing, there was no suggestion of of any misstatement or misleading conduct on the part of anyone that these claims were added later. As in terms of the way the case was resolved and I think should be resolved, it's irrelevant. But at any rate, my only point is that there was no indication at the time that he had been misled in any way, nor do I do I think the record supports the assertion that was made today that somehow, you know, part of this conspiracy to to concoct the lineup in this way accounted for the revised charges. The charges were revised following the preliminary hearing. At the preliminary hearing, the victim identified the defendant. So the identification of the defendant would, of course, be the additional element present in the ultimate charges. So my point is that it is not fair to say that we can simply infer from the record that it was this plot to, as I say, engineer the lineup and then add these charges. That's simply not a fair reading of the record. But the lineup would have been before the preliminary hearing. That's correct. All right. If he from his allegation hadn't been lied to and had spoken to his lawyer and the lawyer said, look, maybe you better stand for this. Maybe we should encourage it, because if you're not identified, there's no way they're going to be able to get you anything except to drive in a car that's been stolen. So that so that now that I'm stringing this out with you, maybe it's not a Sixth Amendment violation. Maybe. I don't know. But why isn't it a due process violation that that that the fact that if he was lied to and that if he had stood for the and for the lineup and had never been identified by her, the government had no case that the victim flunked the six pack and a victim wouldn't identify him and they couldn't identify him in a lineup. They got no case. There's no case they could win. They wouldn't have been charged for God's sake. Judge Count, I have several responses to that. The first is that that is not the claim before the court. The claim before the court is the alleged denial of the Sixth Amendment. And as as I think the court has observed, that requires an interpretation of the Supreme Court's decision in Wade, the lineup case. And if I could quote the relevant portion of Wade, as the district court found, as the state courts found, there is no right to counsel to decide whether to participate in a lineup. And that is exactly the claim that was made here as framed by the district court, whether the petitioner had a right to counsel to decide whether or not to engage in the lineup. The answer to that is no. Why can't we expand that and say that maybe there's a 14th Amendment right here, not to be lied to, to determine whether or not you want to speak to a lawyer to participate in a lineup? Well, two reasons. Because first, Wade says that the right to counsel that is implicated in the lineup, in the lineup that takes place and not, as the court indicated earlier, not when one is on deck, is the potential for prejudice inherent in an in-person lineup where cross-examination at trial would be insufficient to reveal any suggestive influence or improper procedures that might occur in counsel's absence. So that has to do with a tainted lineup. And that is not the claim here. This case has nothing to do with a tainted lineup. It doesn't have to do with a lineup at all because we didn't have one. Yeah, we agree with you. But I think I and my brother, I speak for them, are a little disturbed at the fact that he was lied to, allegedly lied to. Then let me move on to that. And first of all, the simplest response to that, Your Honor, is that insofar as the court is describing expanding, well, it wouldn't be Wade at that point, it would be something else. Not only is that not a claim before the court, but that was not the claim that was preserved and raised in state court. And since we're here at a federal habeas corpus petition, of course, the only relevant inquiry is whether or not a perfected claim based on settled federal law. I can tell from the court knows where I'm going, so I'll stop going there. But at any rate, I think you know the rest of the answer as far as that is concerned. The fact of the matter is, as presented to the state courts, there was not a cognizable right to counsel claim made in this case. And that the scenario that has been proposed, whether or not she would have failed to identify him, whether or not what would have occurred as a result of that, that is all complete speculation in light of the record in this case. What we know in this case is that there was the earlier failure to identify, and that failure was certainly pointed out by defense counsel in terms of her cross-examination and her impeachment and her argument at trial. And we also know, and I think it's a very important fact in this case, that as a matter of law, it is uncontested in this case that the government could have commented on the defendant's refusal to participate in the lineup at trial, and could have requested an instruction that the refusal evidenced consciousness of guilt. And that was not done here. The government did not take advantage of that opportunity. So my point is that the unjustified refusal to participate in the lineup yielded no adverse consequence to the defendant when it easily could have. And of course, it also could have produced another positive identification as it would have been the first time the victim was face-to-face with the petitioner. So for all those reasons, we would submit that the writ was properly denied in this case. The most troubling issue for me in the case is the failure of counsel to move to suppress the in-court identification. Would you mind addressing that? I mean, it seems pretty clear that counsel should have done that. Well, Your Honor, there are many cases in which, and I'm not prepared to cite your reported cases, but I think it's routine, or it's not unusual, let's say, in which there has been a failure to identify prior to something like a preliminary hearing or an in-person interaction with the defendant. And I am not aware of any case, much less a Supreme Court case, which would be what we would be looking for here, that would stand for the proposition that counsel is incompetent for failing to argue the inadequacies of identification at trial rather than moving to suppress. And that is what she did. I mean, it's not as though she didn't make the arguments. Nor, and I think, given the- Well, I think the argument is somewhat different. She made a motion to suppress, I understand that. But at trial, a witness takes a stand and makes an in-court identification. That was the moment to make an objection. You had to make an objection there. But the objection, I submit, would have to be based on some directly controlling authority that would allow a state judge to dismiss the case at that point, given the failure that, as I point out, is argued in many cases. And at this point, in terms of arguing to this court that it's a Strickland violation, the court would have to conclude beyond that, beyond the fact that, to satisfy the first prong of Strickland, any competent attorney would have made that motion. And I submit that that, that it's not a routine motion. Furthermore, this court would- Let me stop you there, though. I mean, in the reality of the courtroom, she wasn't trying to suppress. What I'm, what I'm suggesting is, at the moment that, that, she says, I've seen him in the courtroom and that's the person without, that's the first time you, you have any sort of a contact, you've got to make a motion there, don't you? I mean, what's- Well, again, you- I think you're, as a matter of, there was no downside to, to making a motion to suppress. The fact that there may not be a downside, as the court knows, does not mean that the motion is legally compelled or, or even routine. Let me put it another way. Let's assume, let's assume, and I, and I know you dispute this, but, but let's assume that the likelihood was that if the motion had been made, the, it would have been granted. Now, just, I'm assuming that hypothetically. Why, why wouldn't that be a Strickland violation in the context of this case? Because the witness identification was critical. Well, it would not be because, if it would not be, it would be because the, the question would be not necessarily whether or not a meritorious motion would have been granted, but whether any competent attorney would have necessarily, would have, would have inevitably been required to make the motion. And that, I submit, is what is missing here, a requirement that in these circumstances, again, getting back to, you know, that, that AEDPA, that, that the Supreme Court has said this sort of motion must be made. But I don't, my, my strong suspicion is that a motion like that, again, given the realities of the way identifications sometimes proceed, would have been denied. But if it's a Strickland claim, which it is now, the court is required to find that it necessarily would have been meritorious. And I, I think that I can envision a. Well, that's why I asked you to assume hypothetically. And I can envision. See, I guess reasoning back, we don't, I don't think you have to say that here are the, here, here's the mechanical way to, to conduct a criminal trial. If you violate this, you have a Strickland violation one way or the other. It depends on context, depends on motion. But I think, certainly under Strickland, that if you have a meritorious motion that you should have made that would have altered the outcome of a trial, you can say that the failure to make the motion at least gets you pretty close to a Strickland violation. I mean, I think it has to be a Strickland violation if there's a, there's a dispositive motion you could have made and you didn't make it. Well, let, let me back up. Again, that's hypothetical. I'm not saying that. All right. Let me back up then vis-a-vis that hypothetical and point out that if that hypothetical assumes that the motion would have been meritorious. Yes. I'm not prepared to acknowledge that given a situation in which the, there, there is, as you know, this was a, you know, the confrontation between the defendant and the victim was short. She had a limited opportunity to see him. He is found in her car. His fingerprints are in her car. His, his location is placed there near the time of the crime in terms of where he was residing. Yes. So I wasn't too prejudiced yet. I, I, that's why I actually assume hypothetically that it was, I was on just prong one. Should they have made the motion? Now, the question is, even if meritorious would have been, was there a Strickland prejudice case? That's a, that's a different question. And the Manchester, Manchester judge here found that the motion would not have been successful then, but that's far different saying it shouldn't have been made. But, but as the court is aware, ultimately the Strickland claim is resolved by virtue of the second prong. Sure. Sure. I was just, I was just discussing the first prong with you because you said that no, you said that it wasn't required to have been made. And, and I think, I think one could strongly suspect that, that in a trial court, the response to the motion would have been that these are matters that will be resolved on cross-examination and argument in terms of the strength of this identification. And if the court is interested, again, I'm sure in California and elsewhere, there are plenty of cases on a previous failure to identify that is, that is rectified at, at some in court proceeding. Well, I know these identifications take place right in court and the defendant is, is there in a jail garb and you may not know this, but I served on the municipal court and the superior court. I did know that, your honor. And handled the... In Van Nuys, if I recall. What? In Van Nuys, if I recall correctly. No, no, no. You can make it part of your report. Van Nuys and Brunswick Drug Building and other places, but in the Hall of Justice, but that's a common way that defendants are identified. They're sitting at counsel table next to their attorney and identifications are made that way. I don't know if that's a really reliable way to make an identification. I think it's pretty suggestive. The only time that lawyers asked me to, you know, kind of spread the defendants around and, and we had a witness who make an, make a, make a, an identification. And the witness got off the stand and looked at everyone in the courtroom and, and picked one of the government's employees out, you know, it was just their lunchtime taking in the, the entertainment factor. But was there, was there an instruction asked for on the inherent unreliability of eyewitness identification? That I don't recall, Your Honor. That's in Calgic, isn't it, now? I don't know that there is a Calgic instruction that, that pinpoints the theory that closely. There certainly was argument made. How close to that? Well, again, I, I, I, and I, and I don't know, I don't, that the, the, if there was a failure to ask for an instruction, I don't believe that's a claim before the court. As I mentioned, there certainly was, that issue was highlighted for the jury. So it's not as though the jury was not aware of the differences between the way in which the identification had been made and could have been made. Did she testify, when she testified at trial, did she testify that, you know, she was out there, it was dark, I think she was cleaning the windshield, wasn't she? Correct, she was hosing up the car. And this person came up from behind her, pushed her, jumped in the car and drove off, and that she didn't really have a clear look at that person's face? There was actually a, I believe, as I recall, the, the victim did clarify some comments made by the officer and, and it was, again, it was, and, and I think she disputed to some degree, as I recall, his version of what she had said, but, but it was, it was evident, obviously, to the jury that there had been a limited opportunity to observe the defendant if that, you know, the weight of that was up to the jury to decide. I, I can't resist pointing out, though, finally, then, that insofar as, and, and ultimately, of course, in terms of the inherent suggestiveness of these types of procedures, if the Supreme Court looks at that at some point, that, that will be the law that applies in these cases. But I, I can't resist pointing out that vis-a-vis the photo show-up, which, as we've said, the victim flunked and, or at least did not, you know, make a positive identification from, and the in-court preliminary hearing and trial identification, the petitioner did have another opportunity to have a, a, if you will, a live identification and to determine whether or not the victim could make him out, and he refused it. It was his call. He's the one that absented himself from the lineup. So it seems to me there's a certain irony in arguing years later on habeas corpus, well, the only time she ever got a chance to look at me was when she identified me. We'll never know if she would have identified him at that lineup because he precluded that opportunity. Thank you. All right. Thank you very much. Just briefly, obviously, our claim is that he refused it because he was hoodwinked out of it. He didn't deny his right of counsel. That's right. So it's not that he just made a tactical decision, but I wanted to suggest one approach based on your Honor's statement that the court's bothered by the fact that he was hoodwinked or lied to. He did make a request for an evidentiary hearing in the district court. And the evidentiary hearing would have entailed whether, in fact, he was lied to and whether, in fact, it did lead as approximate cause to the charges filed the next morning, your Honor's point, to get it beyond speculation. One of the reasons I can't give you more at this point is because the evidentiary hearing requested by Mr. Morris in the district court was denied. So I would ask the court to consider, as one practical approach to this case, a remand with specified questions for an evidentiary hearing. He did ask for the evidentiary hearing. The government's position is that even if he was lied to, it's no foul, nothing wrong, because he had no right to have a lawyer at that point when he was lied to in the first place. That, in my opinion, is the critical question here. Did the Sixth Amendment right to counsel attach? And what is, under Wade, what is the lineup? And I would agree with you. We have to, under fact number one, question number one, it's a Sixth Amendment violation. So there has to be a Sixth Amendment violation right to counsel that attaches. So that is the question of whether or not that was the critical stage. Of course, we're in Aetna here and, you know, you've got to be careful of what the Supreme Court has said or that fits into this case. And there's not too much law out there, is there? No, and that's why I'm arguing my primary argument is under Wade. I think you've got to go under, say, it's contrary to clearly established federal law. Certainly Wade is clearly established by this point. We can all take a look at Wade and see the four corners of Wade on the site that I gave you there, the facts of that case where they observed stuff that was happening as the lineup was being assembled. The way I read Wade is the assembly is part of the lineup. And if so, I would suggest that when they're assembling the lineup, asking the guy if he wants to talk to counsel, counsel is sitting outside ready to consult. That's why she was down there that day. That assembly, that's part of the lineup. All right. Thank you. I just want to say this, Mr. Glassman and Mr. Harris, that you see the problem with these habeas cases, we get an enormous number of them. And I remember at one time, oh, many years ago, maybe 10, 15, when Evel Younger was attorney general, and I knew him very well, wonderful person. And every time the Ninth Circuit or the district court would grant a writ, he would just use that as a great opportunity to hold a press conference. And so I checked with our clerk downtown, the district court, and the clerk told me that there was something like, oh, a thousand habeas petitions filed in the district court. And I said, well, how many were granted? And he said, one. And so, you know, the republic isn't going to collapse because of that. But the problem with this whole setup is that I know the pressures that all the courts are under, but you have the trials in the Superior Court. Of course, there's a very high acquittal rate, right? I think there is in L.A. Maybe it's 50 percent. In our court, in the U.S. District Court, the acquittal rate is maybe 1 percent. And so then these cases go up and you have thousands of them. They go up on appeal. And then after they've gone through that, then you have the habeas appeal. And all they get are postcard denials, you know, denied, denied. Then they come to us. But we just can't just get a postcard and write denied on them. We have to give a reasoned disposition. And so, because we've met with the state judges for years on this, and we had Malcolm Lucas who came from our district court, and he was a colleague of mine. He was chief justice. So we never were able to get this problem solved. So what do we do? Judge Hill, who's gone now, he got this idea of magistrates, see, because we had so many. We'll have the magistrates look at them. And he went to Washington with, I think, Judge Ferguson. They got that through. And so we now have, I'm not sure how many we have in L.A., but maybe it's 30 magistrates that do nothing. Or spend a lot of their time just on state habeas matters. Now, they wouldn't have to spend all that time, and maybe we wouldn't even need all of them, if the state did its job on these habeas matters. If we got a reasoned disposition. You know what I'm saying? Well, Judge Ferguson, I'd love to debate habeas purposes with other people on the way that I'm doing this, but I would point out since you're asking. I used to tell this to Evel in the steam room at the L.A. Athletic Club, and he'd agree with me, but nothing ever happened. This case, for example, is a case in which the defendant did receive a reasoned disposition citing state and federal law from three state appellate judges. So there are plenty of... I'm not talking about this case. I'm talking about in general. I know it was so busy out here, I may never have moved from Philadelphia. Okay. Are you in Philadelphia now? Originally. Okay. Well, all right. I'm thinking of moving out of California. Oh, yeah. And he's coming out again. Well, this would be a good week if he cares out there. That's our problem. Okay. All right. See you later. All right, we'll take up these three consolidated cases, West Coast Products versus Green, Tong, May, Raymond, and others.
judges: Pregerson, Cowen, Thomas